DANIEL L. GERMAIN (CA #143334)
germain@lalawyer.com
**ROSMAN & GERMAIN APC**
5959 Topanga Canyon Blvd., Suite 360
Woodland Hills, CA 91367
Telephone: (818) 788-0877

JAMES M. FICARO
jficaro@weiserlawfirm.com
**THE WEISER LAW FIRM, P.C.**
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
West Conshohocken, PA 19428
Telephone: (610) 225-2677

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

MORGAN SMITH, derivatively on behalf of CHARGEPOINT HOLDINGS, INC.,

Plaintiff,

v.

RICHARD WILMER, ROXANNE BOWMAN, ELAINE L. CHAO, BRUCE R. CHIZEN, AXEL A. HARRIES, JEFFREY HARRIS, SUSAN HEYSTEE, MARK LESCHLY, MICHAEL LINSE, EKTA SINGH-BUSHELL, G. RICHARD WAGONER, JR., PASQUALE ROMANO, and REX S. JACKSON,

Defendants,

and

CHARGEPOINT HOLDINGS, INC.,

Nominal Defendant.

Case No.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**JURY TRIAL DEMANDED**

# <u>SHAREHOLDER DERIVATIVE COMPLAINT</u>

1. Plaintiff Morgan Smith ("Plaintiff"), by and through his attorneys, hereby submits this Shareholder Derivative Complaint (the "Complaint") for the benefit of Nominal Defendant ChargePoint Holdings, Inc. Corporation ("ChargePoint" or the "Company"), against certain current and former members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' (defined below) breaches of fiduciary duties and unjust enrichment, from December 7, 2021 to November 16, 2023 (the "Relevant Period"). Plaintiff makes these allegations upon personal knowledge and the investigation of counsel, which included, among other things, review and analysis of: a) public filings made by ChargePoint and other related parties and non-parties with the Securities and Exchange Commission ("SEC"); b) press releases and other publications disseminated by certain of the defendants and other related non-parties; c) news articles, shareholder communications and postings on ChargePoint's website concerning the Company's public statements; d) publicly available filings in a related securities class action lawsuit captioned *Khan v. ChargePoint Holdings, Inc. et al.*, No. 23-cv-06172, pending in the U.S. District Court for the Northern District of California (the "Securities Action"); and e) other publicly available information concerning ChargePoint and Defendants (defined below). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

2. ChargePoint is a provider of networked electric vehicle charging solutions, including charging hardware and the ChargePoint cloud subscription platform. The Company represents that its products and services are designed to support a broad range of charging use cases, including residential, workplace, parking, hospitality, retail, and transportation fleet environments.

3. Throughout the Relevant Period, the Company issued a series of press releases and filings with the SEC that portrayed its financial performance and prospects in a consistently positive light. These statements, however, were materially false and misleading because they omitted material facts concerning the Company's business, operations, and prospects. Specifically, Defendants failed to disclose that: (1) a material portion of ChargePoint's reported revenue was derived from undisclosed practices that violated GAAP and the Company's own revenue recognition policy, including unauthorized shipments to customers who had not approved delivery, shipments of

incomplete or non-functioning products, channel stuffing through resellers by means of coercion and undocumented side deals and rebates, and premature software token activations; (2) as a result, ChargePoint's reported revenue growth was not attributable to organic customer demand and was unsustainable; (3) ChargePoint was incurring elevated component costs and supply overruns associated with its first-generation direct current ("DC") charging products; (4) as a result, the Company was likely to incur impairment charges; (5) these conditions were adversely impacting, and were reasonably likely to continue adversely impacting, ChargePoint's profitability; and (6) ChargePoint maintained deficient internal controls. Consequently, Defendants' statements concerning the Company's business, operations, and prospects were materially false and misleading when made and lacked a reasonable basis.

4. The truth began to emerge on September 6, 2023, when the Company issued a press release disclosing that it had recorded a $28 million inventory impairment charge, which ChargePoint acknowledged was "taken to address legacy supply chain-related costs and supply overruns on a particular DC product." As a result of these issues, the Company reported that its quarterly GAAP gross margin "was 1%, down from 17% in the prior year's same quarter, and non-GAAP gross margin was 3%, down from 19% in the prior year's same quarter." This disclosure revealed the adverse impact that the previously undisclosed component cost increases and supply overruns were having on the Company's financial performance.

5. On this news, ChargePoint's stock price declined approximately 11% in a single trading day, closing at $6.29 per share on September 7, 2023.

6. On November 16, 2023, the Individual Defendants caused ChargePoint to file a Form 8-K with the SEC attaching two press releases. The Company disclosed that Defendant Romano, ChargePoint's President and Chief Executive Officer ("CEO"), and Defendant Jackson, ChargePoint's Chief Financial Officer ("CFO"), were departing the Company effective immediately. ChargePoint also disclosed a $42 million inventory impairment charge "related to product transitions and to better align inventory with current demand," which resulted in projected "GAAP gross margin of negative 23% to negative 21% and non GAAP gross margin of negative 19% to negative 17%."

7. On this news, ChargePoint's stock price declined approximately 35% in a single trading day, closing at $2.02 per share on November 17, 2023.

8. As a result of the Individual Defendants' misconduct, ChargePoint, Defendant Romano, and Defendant Jackson (among others) were named as defendants in the Securities Action by investors who allege they were damaged when they purchased ChargePoint shares during the Relevant Period. On May 21, 2026, the Honorable Noel Wise issued an order denying the Securities Action defendants' motion to dismiss.

9. As a result of these developments, Plaintiff served a pre-suit litigation demand on the ChargePoint Board of Directors ("Board") on October 9, 2026. The Demand outlined the allegations detailed herein and demanded the Board commence an investigation in order to protect the Company's viable claims against the Individual Defendants.

10. Notably, the Demand also stated:

> In the meantime, because the statute of limitations to commence a civil action against Management to recover for the benefit of the Company likely expires on November 16, 2023 under 10 Del. C. § 8106, and because Stockholder wishes to afford the Board sufficient time to undertake the independent investigation sought herein and commence litigation if necessary, Stockholder further requests that the Board enter into tolling agreements with each of the members of Management names herein.

11. A true and correct copy of the Demand is attached hereto as Exhibit A.

12. On October 16, 2026, counsel for plaintiff received an email from attorneys at Sidley Austin LLP, acknowledging receipt of the Demand and requesting Plaintiff provide evidence of his current stockholdings in ChargePoint stock. The October 16, 2026 correspondence did not address the Demand's request that the Board enter into sufficient tolling agreements. A true and correct copy of the October 16, 2026 email is attached hereto as Exhibit B.

13. Plaintiff responded on October 23, 2026, providing counsel with proof of Plaintiff's continuous and contemporaneous shareholdings.

14. To date, Plaintiff has received no correspondence or evidence to suggest that the Board has entered into tolling agreements with the defendants named herein to preserve the Company's valuable claims. Plaintiff was therefore obligated to commence this litigation to act in the best interests of the Company. By failing to achieve this most basic of tasks, the Board has not

demonstrated it will commence an investigation in good faith and this shareholder derivative action should be permitted to proceed.

**JURISDICTION AND VENUE**

15. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

16. This Court has jurisdiction over each Defendant because they reside in this district or have sufficient minimum contacts with this district to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. The Court has personal jurisdiction over the Nominal Defendant because it is authorized to do business in this state, has consented to service in this state and its principal place of business is within this district.

17. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because one or more of the Defendants either resides in or maintains offices in this district, a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to the Company occurred in this district, and Individual Defendants have received substantial compensation in this district by doing business here and engaging in numerous activities that had an effect in this district.

**PARTIES**

18. Plaintiff is a current shareholder of ChargePoint and has continuously held ChargePoint common stock since November 2021. Plaintiff is a citizen of Colorado.

19. Nominal Defendant ChargePoint is incorporated under the laws of Delaware, with its principal executive office located at 240 East Hacienda Avenue, Campbell, CA 95008. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CHPT."

20. Defendant Richard Wilmer ("Wilmer") has served as ChargePoint's President, Chief Executive Officer ("CEO"), and a member of the Board since November 16, 2023. Prior to his appointment as CEO, Defendant Wilmer served as the Company's Chief Operating Officer ("COO") from around December 2022 through November 2023, and as the Company's Chief Customer and Operations Officer after joining ChargePoint on or around July 2022. Upon information and belief, Defendant Wilmer is a citizen of California.

21. Defendant Roxanne Bowman ("Bowman") has served as a member of ChargePoint's Board since February 2021, previously served as director of Legacy ChargePoint since August 2019, and is currently a member of the Company's Nominating and Corporate Governance Committee. Upon information and belief, Defendant Bowman is a citizen of North Carolina.

22. Defendant Elaine L. Chao ("Chao") served as a member of ChargePoint' Board from around November 2021 until around July 2026. Upon information and belief, Defendant Chao is a citizen of Kentucky.

23. Defendant Bruce R. Chizen ("Chizen") has served as a member of ChargePoint's Board since February 2021 (and previously as a director of Legacy ChargePoint since December 2014) and has served as Chair of the Board since 2021 and is currently a member of the Company's Compensation and Organizational Development Committee. Upon information and belief, Defendant Chizen is a citizen of California.

24. Defendant Axel A. Harries ("Harries") has served as a member of ChargePoint's Board since February 2021. Upon information and belief, Defendant Harries is a citizen of Alabama.

25. Defendant Jeffrey Harris ("Harris") has served as a member of ChargePoint's Board since February 2021 and currently is the Chair of the Company's Audit Committee. Upon information and belief, Defendant Harris is a citizen of California.

26. Defendant Susan Heystee ("Heystee") has served as a member of ChargePoint's Board since May 2021 and is currently a member of the Company's Audit Committee and the Compensation and Organizational Development Committee. Upon information and belief, Defendant Heystee is a citizen of California.

27. Defendant Mark Leschly ("Leschly") has served as a member of the Board since February 2021 (and previously as a director of Legacy ChargePoint since December 2009) and is currently a member of the Company's Compensation and Organizational Development Committee and Chair of the Nominating and Corporate Governance Committee. Upon information and belief, Defendant Leschly is a citizen of Florida.

28. Defendant Michael Linse ("Linse") has served as a member of the Board since February 2021 (and previously as a director of Legacy ChargePoint since April 2012) and is currently the Chair of the Company's Compensation and Organizational Development Committee. Upon information and belief, Defendant Linse is a citizen of Puerto Rico.

29. Defendant Ekta Singh-Bushell ("Singh-Bushell") has served as a member of the Board since April 2022 and is currently a member of the Company's Audit Committee. Upon information and belief, Defendant Singh-Bushell is a citizen of Florida.

30. Defendant G. Richard Wagoner ("Wagoner") has served as a member of the Board since February 2021 and is currently a member of the Company's Nominating and Corporate Governance Committee. Upon information and belief, Defendant Wagoner is a citizen of Michigan.

31. Defendant Pasquale Romano ("Romano") served as the Company's President, CEO, and as a member of the Board from February 2011 until November 16, 2023. Romano is a named defendant in the Securities Action. Upon information and belief, Defendant Romano is a citizen of California.

32. Defendant Rex S. Jackson ("Jackson") served as the Company's CFO from May 2018 until November 16, 2023. Upon information and belief, Defendant Jackson is a citizen of Georgia.

33. Defendants Romano, Jackson, Wilmer, Bowman, Chizen, Harries, Harris, Heystee, Leschly, Linse, Singh-Bushell, and Wagoner are collectively referred to herein as the "Individual Defendants."

34. Defendants Wilmer, Bowman, Chizen, Harries, Harris, Heystee, Leschly, Linse, Singh-Bushell, and Wagoner are collectively referred to herein as the "Director Defendants."

## THE DEFENDANTS' DUTIES

35. By reason of their positions as officers, directors, and/or fiduciaries of ChargePoint, and because of their ability to control the business and corporate affairs of ChargePoint, the Individual Defendants owed the Company and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage ChargePoint in a fair, just, honest and equitable manner.

36. Further, Defendants were and are required to act in furtherance of the best interests of ChargePoint and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest and benefit. Each director and officer of the Company owes to ChargePoint and its shareholders the fiduciary duty to exercise good faith and due diligence in the administration of the Company's affairs, and in the use and preservation of its property and assets, as well as the highest obligation of fair dealing.

37. Because of their positions of control and authority as directors and/or officers of ChargePoint, having knowledge of material non-public information regarding the Company, the Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. To discharge their duties, the officers and directors of ChargePoint were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties the officers and directors of ChargePoint were required to, among other things:

a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner, and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public; and

c. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

38. Indeed, ChargePoint's Code of Business Conduct & Ethics states as follows:

1. Introduction

This Code of Conduct (the "Code") covers a wide range of business practices and procedures. It does not cover every issue that may arise, but it sets out basic principles to guide all directors, officers and employees of ChargePoint Holdings, Inc. and its subsidiaries (collectively, the "Company"). All directors, officers and employees of the Company should be familiar with the Code, conduct themselves accordingly, seek to avoid even the appearance of improper behavior and report any suspected violations as described in Section 25, "Reporting and Enforcement." The Code should also be provided to and followed by the Company agents and representatives, including consultants.

If you violate the standards in the Code, you may be subject to disciplinary action, up to and including immediate termination of employment.

If a law conflicts with a policy in the Code, you must comply with the law. If you have any questions about these conflicts, ask your manager or the Company's Chief Executive Officer, Chief Financial Officer or designated legal personnel how to handle the situation. The Code supersedes all other codes of conduct, policies, procedures, instructions, practices, rules or written or verbal representations to the extent that they are inconsistent with the Code. We are committed to continuously reviewing and updating our policies and procedures. The Code, therefore, is subject to modification.

Nothing in the Code modifies the Company's at-will employment relationship with its employees, which may only be modified in an express written agreement signed by the employee and the Company's Chief Executive Officer.

2. Purpose

The Code seeks to deter wrongdoing and to:

Promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- Promote full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications made by the Company;

- Promote compliance with applicable governmental laws, rules and regulations;

- Protect Company assets, including corporate opportunities and confidential information;

- Promote fair dealing practices;

- Deter wrongdoing;

- Promote prompt internal reporting to an appropriate person or persons identified in the Code of violations of the Code; and

- Ensure accountability for adherence to the Code.

3. Compliance with Applicable Laws, Rules and Regulations

Obeying the law is the foundation on which the Company’s ethical standards are built. You must comply with applicable laws, rules and regulations. Although you are not expected to know the details of these laws, it is important to know enough to determine when to seek advice from managers or other appropriate personnel.

4. Honest and Ethical Conduct

The Company’s policy is to promote high standards of integrity by conducting its affairs honestly and ethically. Each director, officer and employee must act with integrity and observe the highest ethical standards of business conduct in his or her dealings with the Company's customers, suppliers, partners, service providers, competitors, employees and anyone else with whom he or she has contact in the course of performing his or her job.

***

9. Public Disclosure of Information

The Company's periodic reports and other documents filed with the SEC, including all financial statements and other financial information, must comply with applicable federal securities laws and SEC rules.

Each director, officer and employee who contributes in any way to the preparation or verification of the Company's financial statements and other financial information must ensure that the Company's books, records and accounts are accurately maintained. Each director, officer and employee must cooperate fully with the Company's accounting and internal audit departments, as well as the Company's independent public accountants and counsel.

Each director, officer and employee who is involved in the Company's disclosure process must:

• Be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and

• Take all necessary steps intended to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

10. Outside Communications

The Company has established specific policies regarding who may communicate information to the public, the press and the financial analyst communities:

• The Company’s Chief Executive Officer, Chief Financial Officer, Chief Marketing Officer and investor relations personnel are official spokespeople for financial matters.

• The Company’s Chief Executive Officer, Chief Financial Officer, Chief Marketing Officer, and corporate communications personnel are official spokespeople for public comment, press, marketing, technical and other such information.

• All Company related communications made on behalf of the Company to public audiences, including formal communications and presentations made to investors, customers or the press, require prior approval in accordance with the Company’s established policies for such communications. Such approval includes review by investor relations or corporate communications personnel, as applicable, with final review by the Company’s Chief Executive Officer or Chief Financial Officer, who will ensure that all necessary review is undertaken.

These designees for such communications are the only people who may communicate externally on behalf of the Company. Employees and directors should refer all inquiries or calls from the press, from shareholders or from financial analysts to the investor relations department or the Company’s Chief Financial Officer, who will see that the inquiry is directed to the appropriate authority within the Company. Employees and directors may not publish or make public statements outside the scope of employment with or service to the Company that might be perceived or construed as attributable to the Company without preapproval from the Company’s Chief Executive Officer, Chief Financial Officer or General Counsel, as appropriate. Any such statement must include the Company’s standard disclaimer that the publication or statement represents the views of the specific author and not of the Company. Consult the Investor Relations and Communications Policy for additional information.

***

CODE OF ETHICS FOR CEO
AND SENIOR FINANCIAL OFFICERS

In addition to being bound by all other provisions of this Code of Conduct, the CEO and senior financial officers are subject to the following additional specific policies:

The CEO and all senior financial officers are responsible for full, fair, accurate, timely and understandable disclosure in any public filings or other public communications made by the Company which contain financial information. Accordingly, it is the responsibility of the CEO and each senior financial officer promptly to bring to the attention of the General Counsel any material information of which he or she may become aware that affects the disclosures made by the Company in any public filing or other public communications which contain financial information.

The CEO and each senior financial officer shall promptly bring to the attention of the General Counsel and the Audit Committee any information he or she may have concerning (a) significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

The CEO and each senior financial officer shall promptly bring to the attention of the General Counsel and the Audit Committee any information he or she may have concerning a material misstatement in any reported financial information of the Company, in particular any material over or understatement of the Company's assets, liabilities, revenues, expenses, and/or cash flows.

The CEO and each senior financial officer shall promptly bring to the attention of the General Counsel and the Audit Committee any information such officer may have concerning any violation of this Code of Conduct, including any actual or apparent conflicts of interest between personal and professional relationships, involving any management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

The CEO and each senior financial officer shall promptly bring to the attention of the General Counsel and the Audit Committee any information such officer may have concerning evidence of a material violation of the securities laws or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof.

The Board of Directors shall determine, or designate appropriate persons to determine, appropriate actions to be taken in the event of violations of this Code of Conduct or of these additional procedures by the CEO and the Company's senior financial officers. Such actions shall be reasonably designed to deter wrongdoing and to promote accountability for adherence to this Code of Conduct and to these additional procedures, and shall include written notices to the individual involved that the Board has determined that there has been a violation, censure by the Board, demotion or

> reassignment of the individual involved, suspension with or without pay or benefits (as determined by the Board) and potential termination of the individual's employment. In determining what action is appropriate in a particular case, the Board or such designee shall take into account all relevant information, including the nature and severity of the violation, whether the violation occurred once or repeatedly, whether the violation appears to have been intentional or inadvertent, whether the individual in question had been advised prior to the violation as to the proper course of action and whether or not the individual in question had committed other violations in the past.

## SUBSTANTIVE ALLEGATIONS

**<u>Background</u>**

39. ChargePoint is a provider of networked solutions for electric vehicle charging, including charging hardware and its cloud-based subscription platform. During the Relevant Period, the Company represented that its products and services were designed to accommodate a diverse range of charging scenarios, including residential, workplace, parking, hospitality, retail, and transportation fleet applications.

40. Throughout the Relevant Period, ChargePoint publicly represented that it recognized revenue in accordance with generally accepted accounting principles (GAAP) and with the Company's own stated revenue recognition policy under ASC 606, and it attributed its reported quarter-after-quarter revenue growth to organic customer demand for its products. In reality, a material portion of the revenue the Company reported in each quarter of the Relevant Period was generated through five categories of undisclosed practices that violated both GAAP and the Company's stated policy, and that were unsustainable, as alleged in the Securities Action.

41. ChargePoint shipped charging products to customers who had not approved delivery, and recognized revenue on those shipments, in violation of ASC 606 Steps 1, 3, and 5. Sales and operations personnel were directed at quarter end to ship all pending orders regardless of customer readiness, including so-called Hold for Release orders, which the Company then booked and billed as revenue.

42. ChargePoint shipped products that customers could not use in order to recognize revenue in the current quarter, in violation of ASC 606 Step 5. This included shipping empty charger frames without internal components.

43. ChargePoint offloaded product on distributors and resellers before end customers needed it, using coercion and undocumented side deals, rebates, and discounts that distorted reported revenue, in violation of ASC 606 Steps 1, 3, and 5. The consequences persisted long after the Relevant Period: as of early 2025, one reseller was still holding nearly $100 million of ChargePoint inventory it could not sell, and another was still holding approximately $40 million.

44. ChargePoint activated software subscriptions for customers that did not exist, and for charging stations that had not been installed or activated, in order to inflate reported subscription revenue, in violation of ASC 606 Steps 1, 3, and 5.

45. Defendant Jackson personally acknowledged and approved terms of undocumented side deals, including rebates, in recurring quarterly calls with a reseller executive, and was required to sign off on discounts beyond the Company's stated promotions.

46. The supply chain disruptions the Company did disclose were the catalyst for this conduct rather than a separate matter. Genuine constraints on specific product lines and components, aggravated by the Company's outsourcing of its accounts payable function, drove Defendants to force revenue from the products that were available. The same constraints led ChargePoint to over-procure its first-generation CPE 250 DC fast charger in a failed attempt to get ahead of them, producing an inventory glut that the Company failed to write down on a timely basis and that ultimately required approximately $70 million in impairment charges.

47. These practices are supported by the firsthand accounts of eleven former ChargePoint employees and a confidential witness, whose knowledge collectively spans every quarter of the Relevant Period, as set forth in the Third Amended Complaint in the Securities Action.

**False and Misleading Statement**

48. The Relevant Period begins on December 7, 2021, when ChargePoint issued a press release (the "December 2021 Press Release") providing a "Third Quarter Fiscal 2022 Financial Overview." In the press release, Defendant Romano made the following statement: "ChargePoint has delivered another strong quarter, as we have continued to scale our commercial, fleet and residential verticals across two continents[.]" Romano further represented that "[t]he investments we have made over many years have enabled us to capture charging demand from customers preparing for an electric

future. This quarter we added more customers at an accelerated rate, while also successfully closing two acquisitions."

49. The December 2021 Press Release further highlighted the Company's quarterly revenue performance, stating:

> "revenue was $65.0 million, an increase of 79% from $36.4 million in the prior year's same quarter. Networked charging revenue for the third quarter was $47.5 million, an increase of 111% from $22.6 million and subscription revenue was $13.4 million, up 24% from $10.8 million."

50. The December 2021 Press Release also highlighted the Company's gross margin performance, stating: "GAAP gross margin was 25%, up from 20% in the prior year's same quarter primarily as a result of product cost improvements and the impact of acquisitions."

51. The December 2021 Press Release also addressed the Company's quarterly net loss, reporting: "GAAP net loss was $69.4 million, which included a $2.4 million loss from the change in fair value of warrant liabilities and $16.0 million in stock-based compensation expense."

52. As for fourth quarter 2022 and full year 2022 guidance, the December 2021 Press Release stated that: "ChargePoint expects revenue of $73 - $78 million for its fourth quarter ending January 31, 2022, and is raising its full year revenue outlook to $235 - $240 million, from $225 - $235 million, for the fiscal year ending January 31, 2022."

53. On March 2, 2022, ChargePoint issued a press release (the "March 2022 Press Release") announcing its fourth quarter and fiscal year 2022 financial results. In the March 2022 Press Release, Defendant Romano stated: "ChargePoint delivered another outstanding quarter, exceeding the high end of both our quarterly and annual revenue guidance and advancing our technology leadership in our commercial, fleet and residential verticals across North America and Europe[.]" Defendant Romano further represented that "[w]e had numerous successes in our first year as a publicly traded company, including a 65 percent year over year increase in annual revenue, two strategic acquisitions, expansion of our activated port count by over 60 percent, and growing our team of world class talent."

54. The March 2022 Press Release further highlighted the Company's quarterly revenue growth, reporting revenue of:

> $80.7 million, an increase of 90% from $42.4 million in the prior year's same quarter. Networked charging systems revenue for the fourth quarter was $59.2 million, an increase of 109% from $28.3 million in the prior year's same quarter and subscription revenue was $17.2 million, up 57% from $11.0 million.

55. In regard to quarterly gross margin, the March 2022 Press Release stated that "GAAP gross margin was 22%, up from 21% in the prior year's same quarter primarily due to the impact of acquisitions."

56. The March 2022 Press Release also addressed the Company's quarterly net loss, reporting: "GAAP net loss was $60.5 million, which included a $16.9 million gain from the change in fair value of warrant liabilities and $15.4 million in stock-based compensation expense."

57. The March 2022 Press Release also provided guidance for the fiscal year ending January 31, 2023, stating that ChargePoint expected "Revenue of $450 million to $500 million."

58. On May 31, 2022, ChargePoint issued a press release (the "May 2022 Press Release") providing a "First Quarter Fiscal 2023 Financial Overview." In the May 2022 Press Release, Defendant Romano stated: "[p]ositive first quarter results, despite expected significant headwinds due to global supply constraints, are a testament to the strength of our business[.]" Romano further represented that "[o]ur investments in a comprehensive portfolio for all verticals we serve continue to set us apart when customers seek a charging solution."

59. The May 2022 Press Release stated the following regarding quarterly revenue:

> $81.6 million, an increase of 102% from $40.5 million in the prior year's same quarter. Networked charging systems revenue for the first quarter was $59.6 million, an increase of 122% from $26.8 million in the prior year's same quarter and subscription revenue was $17.6 million, up 63% from $10.8 million.

60. In regard to quarterly gross margin, the May 2022 Press Release stated that:

> GAAP gross margin was 15%, down from 23% in the prior year's same quarter as newer, currently lower margin, products performed strongly relative to more mature, higher margin offerings, and due to supply chain disruptions, which affected both cost and supply availability.

61. The May 2022 Press Release also addressed the Company's quarterly net loss, reporting that:

> First quarter GAAP net loss was $79.4 million, down from $89.3 million in the prior year's same quarter. Non-GAAP pre-tax net loss in the first quarter, which primarily excludes $24.0 million in stock-based compensation expense, $3.0 million amortization expense from acquired intangible assets and other items, was $52.8 million as compared to $71.7 million in the prior year's same quarter. Non-GAAP Adjusted EBITDA Loss, which primarily excludes stock-based compensation expense, depreciation expense and amortization expense of acquired intangible assets, was $48.9 million in the first quarter, as compared to $67.1 million in the prior year's same quarter.

62. The May 2022 Press Release also provided guidance for the second quarter of fiscal year 2023, stating that the Company: "expects revenue of $96 million to $106 million. At the midpoint, this represents an anticipated increase of 80% as compared to the prior year's same quarter."

63. The press release further stated that, for the full fiscal year ending January 31, 2023, ChargePoint continued to expect the same revenue, non-GAAP gross margin, and non-GAAP operating expense guidance previously reported in the March 2022 Press Release.

64. On August 30, 2022, ChargePoint issued a press release (the "August 2022 Press Release") providing a "Second Quarter Fiscal 2023 Financial Overview." In the August 2022 Press Release, Defendant Romano stated: "ChargePoint delivered another strong quarter, with continued growth across all verticals and geographies[.]" Romano further represented that "[w]e continue to execute on our strategy, as demand continues to grow for our portfolio of industry-leading charging solutions for every vertical and in both North America and Europe."

65. The August 2022 Press Release further highlighted ChargePoint's quarterly revenue growth, reporting revenue of:

> $108.3 million, up 93% from $56.1 million in the prior year's same quarter. Networked charging systems revenue for the second quarter was $84.1 million, up 106% from $40.9 million in the prior year's same quarter and subscription revenue was $20.2 million, up 68% from $12.1 million.

66. The August 2022 Press Release also addressed ChargePoint's quarterly gross margin, reporting:

> "GAAP gross margin was 17%, down from 19% in the prior year's same quarter primarily due to supply chain disruptions, which affected both cost and supply availability as well as increasing new product introduction and transition costs."

67. The August 2022 Press Release also addressed the Company's quarterly net loss, reporting: GAAP net loss was $92.7 million, as compared to $84.9 million in the prior year's same quarter. It also provided guidance for the third quarter of fiscal year 2023, stating that the Company: "expects revenue of $125 million to $135 million. At the midpoint, this represents an anticipated increase of 100% as compared to the prior year's same quarter."

68. The press release further stated that, for the full fiscal year ending January 31, 2023, ChargePoint continued to expect the same revenue, non-GAAP gross margin, and non-GAAP operating expense guidance previously disclosed in the March 2022 and May 2022 Press Releases.

69. On December 1, 2022, ChargePoint issued a press release (the "December 2022 Press Release") providing a "Third Quarter Fiscal 2023 Financial Overview." In the December 2022 Press Release, Defendant Romano stated: "ChargePoint delivered another quarter of growth exceeding 90% year-over-year, as we continue to scale the business to meet strong demand for our solutions across North America and Europe[.]" Romano further represented that "[o]ur networked, asset-light business model continues to enable our growth as we strive to deliver improved margins and operating leverage."

70. The December 2022 Press Release further highlighted ChargePoint's quarterly revenue growth, reporting revenue of:

> "$125.3 million, up 93% from $65.0 million in the prior year's same quarter. Networked charging systems revenue for the third quarter was $97.6 million, up 105% from $47.5 million in the prior year's same quarter and subscription revenue was $21.7 million, up 62% from $13.4 million."

71. The December 2022 Press Release also addressed ChargePoint's quarterly gross margin, stating:

> GAAP gross margin was 18%, down from 25% in the prior year's same quarter primarily due to supply chain disruptions, which affected both cost and supply availability, and increased new product introduction and transition costs.

72. The December 2022 Press Release also addressed the Company's quarterly net loss, reporting: "GAAP net loss was $84.5 million, as compared to $69.4 million in the prior year's same quarter."

73. The December 2022 Press Release also provided guidance for the fourth quarter and full fiscal year 2023, stating:

> For the fourth fiscal quarter ending January 31, 2023, ChargePoint expects:
>
> • Revenue of $160 million to $170 million. At the midpoint, this represents an anticipated increase of 108% as compared to the prior year's same quarter
>
> • A sequential Non-GAAP gross margin improvement from the third quarter's 20%, resulting in annual gross margin below previous guidance
>
> For the full fiscal year ending January 31, 2023, ChargePoint expects:
>
> • Revenue of $475 million to $485 million. At the midpoint, this represents an anticipated increase of $5 million as compared to previous guidance
>
> • Non-GAAP operating expenses of $325 million to $335 million. At the midpoint, this represents an anticipated decrease of $30 million as compared to previous guidance.

74. On March 2, 2023, ChargePoint issued a press release (the "March 2023 Press Release") providing a "Fourth Quarter Fiscal 2023 Financial Overview." In the March 2023 Press Release, Defendant Romano stated that the Company: "delivered its largest sequential revenue growth to date and another record quarter, although below our guidance range as supply challenges for our DC solutions and quarter end shipment challenges at this growth rate persisted." Romano further represented that ChargePoint "continued to extend our technology and market leadership position across North America and Europe this year while driving 94% year-over-year growth and delivering improving gross margin and better operating expense leverage as we progress toward profitability."

75. The March 2023 Press Release further highlighted ChargePoint's quarterly revenue growth, reporting revenue of:

> $152.8 million, up 93% from $79.3 million in the prior year's same quarter. Networked charging systems revenue for the fourth quarter was $122.3 million, up 109% from $58.7 million in the prior year's same quarter and subscription revenue was $25.7 million, up 50% from $17.2 million.

76. The March 2023 Press Release also addressed ChargePoint's quarterly gross margin, stating: "GAAP gross margin improved sequentially to 22%, but was flat to the prior year's same quarter."

77. The March 2023 Press Release also addressed the Company's quarterly net loss, reporting:

> GAAP net loss was $78.0 million, as compared to $60.1 million in the prior year's same quarter primarily due to a $16.9 million fair value gain of the assumed common stock warrant liability in the prior year quarter and higher stock-based compensation expense in the current quarter.

78. The March 2023 Press Release also provided a "Full Fiscal 2023 Financial Overview," reporting annual revenue of:

> $468.1 million, an increase of 94% from $241.0 million in the prior year. Networked charging systems revenue for the full year was $363.6 million, an increase of 109% from $173.9 million, and subscription revenue was $85.3 million, up 59% from $53.5 million.

79. It also addressed ChargePoint's annual gross margin, stating: "GAAP gross margin was 18%, down from 22% in the prior year."

80. The March 2023 Press Release also addressed ChargePoint's annual net loss, stating: "GAAP net loss was $344.5 million as compared to $132.2 million in the prior year."

81. The March 2023 Press Release also provided guidance for the first quarter of fiscal year 2024, stating that the Company: "expects revenue of $122 million to $132 million. At the midpoint, this represents an anticipated increase of 56% as compared to the prior year's same quarter."

82. On June 1, 2023, ChargePoint issued a press release (the "June 2023 Press Release") providing a "First Quarter Fiscal 2024 Financial Overview." In the June 2023 Press Release, Defendant Romano stated:

> ChargePoint delivered strong results in the first quarter, growing at nearly 60% year-over-year. We focused on delivering our broad portfolio of charging solutions across North America and Europe, while continuing to improve gross margins, and managing operating expenses[.]
>
> ***
>
> [t]he positive first quarter results are a testament to the strength and diversity of our business. As the only charging network to operate across all verticals in North America

> and Europe, we believe we remain well positioned to take advantage of the inevitable long-term growth opportunity ahead.

83. The June 2023 Press Release further highlighted ChargePoint's quarterly revenue growth, reporting revenue of:

> $130.0 million, up 59% from $81.6 million in the prior year's same quarter. Networked charging systems revenue for the first quarter was $98.3 million, up 65% from $59.6 million in the prior year's same quarter. Subscription revenue was $26.4 million, up 49% from $17.6 million.

84. The June 2023 Press Release also addressed ChargePoint's quarterly gross margin, stating: "GAAP gross margin was 23%, up from 15% in the prior year's same quarter." It also addressed ChargePoint's quarterly net loss, stating: "GAAP net loss was $79.4 million, down from $89.3 million in the prior year's same quarter."

85. The June 2023 Press Release also provided guidance for the second quarter of fiscal year 2024, stating that the Company: "expects revenue of $148 million to $158 million. At the midpoint, this represents an anticipated increase of 41% over the prior year's same quarter."

86. On June 8, 2023, ChargePoint filed a Quarterly Report on Form 10-Q with the SEC (the "1Q 2024 Quarterly Report"). The 1Q 2024 Quarterly Report was signed by Defendant Jackson and included certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Romano and Jackson. The 1Q 2024 Quarterly Report stated the following, in relevant part:

> Gross profit increased during the three months ended April 30, 2023 compared to the three months ended April 30, 2022 primarily due to an increase in Networked Charging Systems sales that resulted from an increase in the number of Networked Charging Systems delivered and an increase in Subscriptions revenue.
>
> Gross margin increased during the three months ended April 30, 2023 compared to the three months ended April 30, 2022 primarily due to efficiencies realized in managing cost of Networked Charging Systems.
>
> * * *
>
> Disruptions in the manufacturing, delivery and overall supply chain of vehicle manufacturers and suppliers have resulted in additional costs and, to a lesser extent, component shortages, and have led to fluctuations in EV sales in markets around the world. Increased demand for personal electronics and trade restrictions that affect raw materials have contributed to a shortfall of semiconductor chips, which has caused additional supply challenges both within and outside of ChargePoint's industry.

> Ongoing supply chain challenges, component shortages and heightened logistics costs have adversely affected ChargePoint's gross margins in recent quarters and ChargePoint expects that gross margins may continue to be adversely affected by increased material costs and freight and logistic expenses in the future.

**<u>The Truth is Revealed</u>**

87. On September 6, 2023, ChargePoint issued a press release (the "September 2023 Press Release") providing a "Second Quarter Fiscal 2024 Financial Overview." In the September 2023 Press Release, Defendant Romano stated: "[i]n the second quarter, ChargePoint delivered solid growth. Our revenue of $150 million represents a 39% year-over-year increase despite a hesitant economy[.]" Romano further stated that:

> "[i]n the quarter we fortified our access to working capital with a $150 million revolving credit facility and $38 million raised via our 'at-the-market' offering. ***We took an inventory impairment charge to address a significant supply-chain related issue, and we announced an estimated $30 million in annualized operating expense savings from reorganizing the business for agility, efficiency and scale.*** We remain committed to delivering on our goal of generating positive non-GAAP adjusted EBITDA by the end of calendar 2024.

88. With respect to gross margin, the September 2023 Press Release disclosed the following:

> Second quarter GAAP gross margin was 1%, down from 17% in the prior year's same quarter, and non-GAAP gross margin was 3%, down from 19% in the prior year's same quarter, in both cases primarily due to a $28.0 million, or 19 percentage point, inventory impairment charge. This inventory impairment charge was taken to address legacy supply chain-related costs and supply overruns on a particular DC product.

89. The September 2023 Press Release also addressed the impact of the inventory impairment charge on the Company's net loss, stating that:

> GAAP net loss was $125.3 million, up from $92.7 million in the prior year's same quarter. Non-GAAP pre-tax net loss was $86.1 million as compared to $62.3 million in the prior year's same quarter, both reflecting the $28.0 million inventory impairment charge. Non-GAAP Adjusted EBITDA Loss was $81.2 million also reflects this inventory impairment charge in the second quarter, as compared to $56.2 million in the prior year's same quarter.

90. The September 2023 Press Release also provided "Third Quarter, Fourth Quarter and Full Fiscal Year 2024 Guidance," stating:

> For the third fiscal quarter ending October 31, 2023, ChargePoint expects:
>
> - Revenue of $150 million to $165 million. At the midpoint, this represents an anticipated increase of 26% as compared to the prior year.
> - Non-GAAP gross margin of 22 to 25%.
> - Non-GAAP operating expenses of $81 million to $84 million.
>
> For the fourth fiscal quarter ending January 31, 2024, ChargePoint expects non-GAAP operating expenses of $79 million to $82 million. For the full fiscal year ending January 31, 2024, ChargePoint expects revenue of $605 million to $630 million. At the midpoint, this represents an anticipated increase of 32% as compared to the prior year.

91. During a related earnings call held on September 6, 2023, Defendant Jackson addressed the Company's guidance for the third quarter of fiscal year 2024, stating:

> "Turning to guidance. For the third quarter of fiscal 2023, we expect revenue to be $150 million to $165 million, up 26% year-on-year and up 5% sequentially at the midpoint. For the full fiscal year, we are guiding to $605 million to $630 million, up 32% year-on-year at the midpoint.
>
> Regarding gross margin, for the third quarter, we expect to be between 22% and 25% on a non-GAAP basis as we work through the inventory levels discussed earlier. With the inventory issue behind us and aggressive programs for improving our cost structure on supply and manufacturing, we would expect to resume continued improvement in gross margin next year.
>
> Though we don't typically guide on operating expenses, given the reorganization we announced today, we want to help reset everyone on a new level for the remainder of this year."

92. On this news, ChargePoint's stock price declined approximately 11% in a single trading day.

93. On September 11, 2023, ChargePoint filed a Quarterly Report on Form 10-Q with the SEC (the "2Q 2024 Quarterly Report"). The 2Q 2024 Quarterly Report was signed by Defendant Jackson and included certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Romano and Jackson. In the filing, the Company stated:

> For the remainder of fiscal year 2024, ChargePoint expects revenue to grow in both Networked Charging Systems and subscriptions due to increased demand in EVs and the related charging infrastructure market.

94. With respect to the inventory impairment charge, the 2Q 2024 Quarterly Report stated the following:

> Inventory levels are analyzed periodically and written down to their net realizable value if they have become obsolete, have a cost basis in excess of expected net realizable value or are in excess of expected demand. During the three months ended July 31, 2023, the Company recorded an impairment charge of $28.0 million, consisting of $15.0 million charge to write down the carrying value of certain inventory on hand, as well as $13.0 million charge for losses on noncancelable purchase commitments for inventory to be received after July 31, 2023, to reduce the carrying value of certain DC fast charging products to their estimated net realizable value. The inventory impairment charge is included in the cost of revenue - networked charging systems in the condensed consolidated statements of operations.

95. The 2Q 2024 Quarterly Report also included the following risk disclosure concerning the Company's inventory levels:

> ChargePoint's revenue growth is directly tied to the number of passenger and commercial EVs sold, which it believes drives the demand for EV charging infrastructure. The market for EVs is still rapidly evolving and although demand for EVs has grown in recent years, there is no guarantee of such future demand.
>
> ***
>
> ***ChargePoint depends on the timely supply of materials, services and related products to meet the demands of its customers, which depends in part on the timely delivery of materials and services from suppliers and contract manufacturers. Significant or sudden increases in demand for EV charging stations, as well as worldwide demand for the raw materials and services that ChargePoint requires to manufacture and sell EV charging stations, including component parts, may result in a shortage of such materials or may cause shipment delays due to delays could adversely impact ChargePoint's suppliers' ability to meet ChargePoint's demand requirements.*** (Emphasis added).

96. The foregoing statements were materially false and misleading when made because they failed to disclose material adverse facts concerning ChargePoint's business, operations, and prospects. Specifically, the Individual Defendants caused the Company to conceal that: (1) a material portion of ChargePoint's reported revenue was derived from undisclosed practices that violated GAAP and the Company's own revenue recognition policy, including unauthorized shipments, shipments of incomplete or incorrect products, channel stuffing through resellers by means of undocumented side deals and rebates, and premature software token activations; (2) as a result, the Company's reported revenue growth was not attributable to organic demand and was unsustainable;

(3) ChargePoint was incurring increased component costs and supply overruns associated with its DC charging products; (4) those conditions made it likely that the Company would incur impairment charges; (5) those charges and related costs would adversely affect ChargePoint's profitability; and (6) the Company maintained deficient internal controls. Accordingly, the Company's and the Individual Defendants' statements concerning ChargePoint's business, operations, and prospects were materially false and misleading when made and lacked a reasonable basis.

97. On November 16, 2023, ChargePoint filed a Form 8-K with the SEC attaching two press releases. The Form 8-K and one of the press releases disclosed the departures of Defendants Romano and Jackson from the Company. The Form 8-K stated, in relevant part:

> On November 16, 2023, ChargePoint issued a press release announcing the appointment of Mr. Rick Wilmer to the position of President and Chief Executive Officer and Ms. Mansi Khetani to the position of interim Chief Financial Officer, effective immediately. The Company's former President and Chief Executive Officer, Pasquale Romano, resigned from the Company and as a member of the Board of Directors of the Company (the "Board") at the request of the Board and the Company's former Chief Financial Officer, Rex S. Jackson, separated from the Company, respectively, effective November 16, 2023.

98. Also on November 16, 2023, ChargePoint issued a press release (the "November 2023 Press Release") announcing its third quarter fiscal 2024 financial results. In the November 2023 Press Release, Defendant Wilmer stated:

> Our core markets of North America and Europe both came under pressure late in the third quarter, with revenue falling far short of expectations. Overall macroeconomic conditions, along with fleet and commercial vehicle delivery delays impacted anticipated deployments with government, auto dealership and workplace customers.
>
> ***
>
> The ChargePoint board and I are committed to significantly improving operational execution to ensure that the Company is building a stronger, more resilient business for the benefit of all stakeholders. Our first steps are to take an additional non-cash inventory impairment charge related to product transitions and to better align inventory with current demand. We remain committed to our goal of generating positive adjusted EBITDA in the fourth quarter of calendar 2024.

99. Regarding its "Preliminary Third Quarter Fiscal Year 2024 Financial Performance," the November 2023 Press Release stated, in relevant part:

> • Revenue of $108 to $113 million, as compared to $150 to $165 million as previously expected.

- ChargePoint expects to take a non-cash impairment charge of $42 million resulting in GAAP gross margin of negative 23% to negative 21% and non- GAAP gross margin of negative 19% to negative 17%.

- Pre-impairment non-GAAP gross margin of 19% to 21%, as compared to 22% to 25% as previously expected.

- ChargePoint expects GAAP operating expenses of $129 million to $131 million. Non-GAAP operating expenses of $80 million to $82 million, as compared to $81 million to $84 million as previously expected.

100. On this news, ChargePoint's stock price declined approximately 35% in a single trading day, closing at $2.02 per share on November 17, 2023.

**<u>The Securities Action</u>**

101. The misconduct alleged herein is also the subject of the Securities Action filed against ChargePoint and certain of its senior executives, namely Defendants Romano and Jackson and former Chief Commercial and Revenue Officer Michael Hughes. The Third Amended Complaint in the Securities Action alleges that a material portion of ChargePoint's reported Relevant Period revenue was derived from undisclosed practices that violated GAAP and the Company's own revenue recognition policy — including unauthorized shipments, shipments of incomplete or incorrect products, channel stuffing through resellers by means of undocumented side deals and rebates, and premature software token activations — and that the supply constraints and inventory over-procurement described above were the catalyst for, and were concealed by, those practices.

102. On May 21, 2026, Judge Wise denied the Securities Action defendants' motion to dismiss, finding that the Third Amended Complaint substantially clarified and strengthened the allegations, adequately linked Defendants' statements and conduct to the alleged fraud, and addressed the deficiencies identified in the prior dismissal order. The court further rejected Defendants' attempt to have the court weigh competing evidence and resolve factual disputes at the pleading stage, allowing the securities fraud claims to proceed.

**<u>Insider Selling</u>**

103. Rather than disclose material information to the market, Defendants Romano, Jackson, Wilmer, Chizen, Linse, and Singh-Bushell (the "Insider Selling Defendants") used their access to 's

material nonpublic information to sell their personal holdings while the Company's stock remained artificially inflated. As directors and officers, the Insider Selling Defendants were entrusted with, and had access to, material, nonpublic information concerning ChargePoint's true business prospects.

104. While in possession of material nonpublic information, Defendant Romano sold a total of 1,275,802 shares of his personally held ChargePoint stock for proceeds of over $15.2 million before the truth emerged. These sales were timed to capitalize on ChargePoint's artificially inflated stock price.

105. While in possession of material nonpublic information, Defendant Jackson sold a total of 670,269 shares of his personally held ChargePoint stock for proceeds of over $4.6 million before the truth emerged. These sales were timed to capitalize on ChargePoint's artificially inflated stock price.

106. While in possession of material nonpublic information, Defendant Wilmer sold a total of 33,490 shares of his personally held ChargePoint stock for proceeds of over $250,000 before the truth emerged. These sales were timed to capitalize on ChargePoint's artificially inflated stock price.

107. While in possession of material nonpublic information, Defendant Chizen sold a total of 120,000 shares of his personally held ChargePoint stock for proceeds of over $1.86 million before the truth emerged. These sales were timed to capitalize on ChargePoint 's artificially inflated stock price.

108. While in possession of material nonpublic information, Defendant Linse sold a total of 14,135,981 shares of his personally held ChargePoint stock for proceeds of over $144.6 million before the truth emerged. These sales were timed to capitalize on ChargePoint's artificially inflated stock price.

109. While in possession of material nonpublic information, Defendant Singh-Bushell sold a total of 4,622 shares of her personally held ChargePoint stock for proceeds of over $25,000 before the truth emerged. These sales were timed to capitalize on ChargePoint's artificially inflated stock price.

110. In total, the Insider Selling Defendants sold more than 16.2 million shares of their personally-held stock for more than $166.6 million worth of ChargePoint stock at artificially inflated prices, while in possession of material, non-public information.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

111. Plaintiff brings this action derivatively in the right and for the benefit of ChargePoint to redress Defendants' breaches of fiduciary duty and other violations of law.

112. Plaintiff will adequately and fairly represent the interests of ChargePoint and its shareholders in enforcing and prosecuting its rights.

113. As a result of these developments, Plaintiff served a pre-suit litigation demand on the Board on October 9, 2026. The Demand outlined the allegations detailed herein and demanded the Board commence an investigation in order to protect the Company's viable claims against the Individual Defendants.

114. Notably, the Demand also stated:

> In the meantime, because the statute of limitations to commence a civil action against Management to recover for the benefit of the Company likely expires on November 16, 2023 under 10 Del. C. § 8106, and because Stockholder wishes to afford the Board sufficient time to undertake the independent investigation sought herein and commence litigation if necessary, Stockholder further requests that the Board enter into tolling agreements with each of the members of Management names herein.

115. A true and correct copy of the Demand is attached hereto as Exhibit A.

116. On October 16, 2026, counsel for plaintiff received an email from attorneys at Sidley Austin LLP, acknowledging receipt of the Demand and requesting Plaintiff provide evidence of his current stockholdings. The October 16, 2026 correspondence did not address the Demand's request that the Board enter into sufficient tolling agreements. A true and correct copy of the October 16, 2026 email is attached hereto as Exhibit B.

117. Plaintiff responded on October 23, 2026, providing counsel with proof of Plaintiff's continuous and contemporaneous shareholdings.

118. To date, Plaintiff has received no correspondence or evidence to suggest that the Board has entered into tolling agreements with the defendants named herein to preserve the Company's valuable claims. Plaintiff was therefore obligated to commence this litigation to act in the best

interests of the Company. By failing to achieve this most basic of tasks, the Board has not demonstrated it will commence an investigation in good faith and this shareholder derivative action should be permitted to proceed.

**COUNT I**

**Against All Defendants for Breach of Fiduciary Duties**

119. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

120. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of ChargePoint's business and affairs.

121. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

122. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of ChargePoint's shareholders.

123. In breach of their fiduciary duties owed to ChargePoint, the Individual Defendants willfully or recklessly caused the Company to violate federal regulations by falsely stating and/or failing to disclose the Company's true business performance, as alleged herein.

124. In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

125. In further breach of their fiduciary duties owed to ChargePoint, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) a material portion of ChargePoint's reported revenue was derived from undisclosed practices that violated GAAP and the Company's own revenue recognition policy, including unauthorized shipments, shipments of incomplete or incorrect products, channel stuffing through resellers, and premature software token activations; (2) as a result, the Company's reported revenue growth was not attributable to organic

demand and was unsustainable; (3) ChargePoint was incurring increased component costs and supply overruns associated with its first-generation direct current ("DC") charging products; (4) those conditions made it likely that the Company would incur impairment charges; (5) those charges and related costs would adversely affect ChargePoint's profitability; and (6) the Company maintained deficient internal controls. Accordingly, the Company's and the Individual Defendants' statements concerning ChargePoint's business, operations, and prospects were materially false and misleading when made and lacked a reasonable basis.

126. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct those public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth, in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of ChargePoint's securities.

127. The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

128. The Individual Defendants had actual or constructive knowledge that they had caused the Company to engage in the fraudulent schemes set forth herein improperly and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to engage in the fraudulent schemes improperly and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of ChargePoint's securities.

129. At the time that the Insider Selling Defendants sold their ChargePoint stock, they knew the material, non-public information described above and sold stock motivated, in whole or in part, by the substance of such information.

130. The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants misappropriated to their own benefit when they sold ChargePoint stock.

131. The Insider Selling Defendants' sale of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

132. Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, any profits made by the Insider Selling Defendants as a result of their stock sales should be disgorged and the Company is entitled to the imposition of constructive trust on any profits the Insider Trading Defendants obtained thereby.

133. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

134. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, ChargePoint has sustained and continues to sustain significant damages in excess of $75,000 according to proof. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

Plaintiff, on behalf of ChargePoint, has no adequate remedy at law.

**COUNT II**
**Against All Defendants for Unjust Enrichment**

135. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

136. By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of ChargePoint.

137. Plaintiff, as a shareholder and representative of ChargePoint, seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of ChargePoint and that Plaintiff is a proper and adequate representative of the Company;

B. Against Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties in excess of $75,000 according to proof;

C. Directing ChargePoint to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable law and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

D. Awarding to ChargePoint restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: November 12, 2026

Respectfully submitted,

**ROSMAN & GERMAIN APC**

*/s/ Daniel Germain*
DANIEL GERMAIN (CA #143334)
germain@lalawyer.com
5959 Topanga Canyon Blvd., Suite 360
Woodland Hills, CA 91367
Telephone: (818) 788-0877

**THE WEISER LAW FIRM, P.C.**
JAMES M. FICARO
jficaro@weiserlawfirm.com
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
West Conshohocken, PA 19428
Telephone: (610) 225-2677

# EXHIBIT A

THE WEISER LAW FIRM

October 9, 2026

***Via UPS***
Bruce Chizen
Chairman of the Board
ChargePoint Holdings Inc.
254 East Hacienda Avenue
Campbell, CA 95008

**Re: Stockholder Demand Pursuant to Delaware Law**

Dear Mr. Chizen:

The below law firm represents Morgan Smith ("Stockholder"), a stockholder of ChargePoint Holdings Inc. ("ChargePoint" or "Company"). Pursuant to Delaware law, we write on behalf of Stockholder to demand that the Company's Board of Directors ("Board") conduct an investigation in good faith and take action to remedy breaches of fiduciary duties and other serious misconduct by certain current and/or former executive officers and directors of the Company, including yourself ("Chizen"), Rick Wilmer ("Wilmer"), Elaine L. Chao, Michael Linse, Roxanne Bowman, Axel Harries, Rex Jackon ("Jackson"), Mark Leschly, Ekta Singh-Bushell, Mitesh Dhruv, Jeffrey Harris, Susan Heystee, Pasquale Romano ("Romano") and G. Richard Wagoner, Jr. Collectively, the foregoing executive officers and directors of the Company will be referred to herein as "Management."

As you are aware, because of their positions as officers and/or directors of ChargePoint and because of their ability to control the business and corporate affairs of the Company, Management owed and owe ChargePoint and its shareholders the fiduciary obligations of good faith, loyalty, and due care. Management was and is required to use its utmost ability to control and manage the Company in a fair, just and honest manner in compliance with all applicable federal, state, and local laws, rules, and regulations. Similarly, Management was and is required to remain informed as to how the Company conducts its business and affairs, and upon notice or information of imprudent, illegal, or unsound conditions, policies, or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions, policies, or practices, and, if necessary, make such disclosures as necessary to comply with all applicable laws. Stockholder believes that Management has violated these core fiduciary duty principles causing ChargePoint to suffer damages. Specifically, Stockholder believes that Management made false and/or materially misleading statements about the Company's financial position, operational efficiency, and ability to withstand macroeconomic pressures while sustaining its dividend and other capital allocations.

# I. FACTUAL BACKGROUND

## A. Company Background

ChargePoint is a California-based electric vehicle ("EV") charging technology company that, according to its public filings, concentrates its business on "driving the transition to electric mobility across North America and Europe." The Company's offerings include "charging hardware, software, and a variety of services for businesses, homeowners, fleet operators, CPOs, and automakers to optimize their charging operations under their own brands." Specifically, ChargePoint purports to power over 385,000 charging ports, serving more than 1,480,000 active EV drivers quarterly and to provide access to "over 1,370,000 million worldwide public and private charging ports" through its mobile apps and roaming partnerships. The Company's "vision is to create a seamless, ubiquitous, and accessible EV charging experience for all" and its "mission is to simplify the transition to electric vehicles for everyone, from individual drivers to businesses and organizations of all sizes. . ."

As of January 31, 2026, ChargePoint had approximately 1,440 employees worldwide and full year 2026 revenue of $411.2 million. The Company trades on the New York Stock Exchange under the ticker symbol "CHPT," with market capitalization of $235 million.

## B. ChargePoint Misrepresents Revenue, Accounting Practices

On December 7, 2021, ChargePoint filed a current report with the Securities and Exchange Commission ("SEC") on Form 8-K, attached to which was a press release titled ChargePoint Reports Third Quarter Fiscal 2022 Financial Results; Raises Full-Year Revenue Guidance ("12/7/21 Release"). The 12/7/21 Release—like the many that would follow—purported to report accurate revenue and gross margin results, as well as provide reliable full year guidance. Specifically:

- ***Quarterly revenue increased 79%***[1] year over year
- Full-year revenue ***guidance raised to $235 – $240 million***

* * *

Third Quarter Fiscal 2022 Financial Overview

- Revenue. For the third quarter, ***revenue was $65.0 million, an increase of 79%*** from $36.4 million in the prior year's same quarter. ***Networked charging revenue for the third quarter was $47.5 million, an increase of 111%*** from $22.6 million and ***subscription revenue was $13.4 million, up 24%*** from $10.8 million in the prior year's same quarter. ***Revenue growth was significant*** in North America and Europe across ChargePoint's commercial, fleet and residential verticals.

[1] All emphasis added throughout.

- Gross Margin. Third quarter ***GAAP [generally accepted accounting principles] gross margin was 25%***, up from 20% in the prior year's same quarter primarily as a result of product cost improvements and the impact of acquisitions. Third quarter non-GAAP gross margin, which primarily excludes stock-based compensation expense and amortization from acquired intangible assets, was 27% compared to 20% in the prior year's same quarter.

* * *

Fourth Quarter and Full-year Guidance

***ChargePoint expects revenue of $73 - $78 million for its fourth quarter*** ending January 31, 2022, and is ***raising its full year revenue outlook to $235 - $240 million***, from $225 - $235 million, for the fiscal year ending January 31, 2022. . .

Commenting on the reported results, Romano stated in the 12/7/21 Release "ChargePoint has delivered ***another strong quarter*** . . ." and "[t]he investments we have made over many years have enabled us to capture charging demand from customers preparing for an electric future. This quarter we ***added more customers at an accelerated rate***, while also successfully closing two acquisitions."

On March 2, 2022, ChargePoint filed a current report with the SEC on Form 8-K, attached to which was a press release titled ChargePoint Reports Fourth Quarter and Full Fiscal Year 2022 Financial Results ("3/2/22 Release").

The 3/2/22 Release again purported to announce accurate revenue and gross margin results as well as guidance, stating:

- ***Quarterly revenue increased 90%*** year over year and ***annual revenue increased 65%*** year over year, both above top-end of guidance
- Over 174,000 activated ports as of January 31, with approximately 51,000 in Europe
- Fleet momentum continues with leading fleet companies: Element, LeasePlan USA, Wex, and Wheels Donlen
- ***Expects annual revenue of $450 million to $500 million for fiscal year 2023***

* * *

Fourth Quarter Fiscal 2022 Financial Overview

Revenue. For the fourth quarter, ***revenue was $80.7 million, an increase of 90%*** from $42.4 million in the prior year's same quarter. ***Networked charging systems revenue for the fourth quarter was $59.2 million, an increase of 109%*** from $28.3

million in the prior year's same quarter and ***subscription revenue was $17.2 million, up 57%*** from $11.0 million in the prior year's same quarter.

Gross Margin. Fourth quarter ***GAAP gross margin was 22%, up from 21%*** in the prior year's same quarter primarily due to the impact of acquisitions. Fourth quarter non-GAAP gross margin, which primarily excludes stock-based compensation expense and amortization from acquired intangible assets, was 24% compared to 22% in the prior year's same quarter primarily due to the impact of acquisitions.

*  *  *

Full Fiscal 2022 Financial Overview

- Revenue. For the full year, ***revenue was $242.3 million, an increase of 65%*** from $146.5 million in the prior year. ***Networked charging revenue for the full year was $174.4 million, an increase of 90%*** from $91.9 million and ***subscription revenue was $53.5 million, up 32%*** from $40.6 million in the prior year. Subscription growth while strong, lagged growth in networked charging revenue due to product mix and activation lag.
- Gross Margin. Full year ***GAAP gross margin was 22%, relatively unchanged*** from the prior year. Full year non-GAAP gross margin, which primarily excludes stock-based compensation expense and amortization from acquired intangible assets, was 24% compared to 23% in the prior year. . .

In the 3/2/22 Release, Romano again touted ChargePoint's financial performance during the quarter, stating "ChargePoint delivered ***another outstanding quarter, exceeding the high end of both our quarterly and annual revenue guidance*** . . ." and that "We had numerous successes in our first year as a publicly traded company, including a ***65 percent year over year increase in annual revenue***, two strategic acquisitions, expansion of our activated port count by over 60 percent, and growing our team of world class talent."

On May 31, 2022, ChargePoint filed a current report with the SEC on Form 8-K, attached to which was a press release titled ChargePoint Reports First Quarter Fiscal Year 2023 Financial Results ("5/31/22 Release"). The 5/31/22 Release stated, in relevant part:

***Quarterly revenue increased 102% year over year reflecting momentum across all verticals***

*  *  *

First Quarter Fiscal 2023 Financial Overview

- Revenue. For the first quarter, ***revenue was $81.6 million, an increase of 102%*** from $40.5 million in the prior year's same quarter. ***Networked charging systems revenue for the first quarter was $59.6 million, an***

***increase of 122%*** from $26.8 million in the prior year's same quarter and ***subscription revenue was $17.6 million, up 63%*** from $10.8 million in the prior year's same quarter.

* * *

Second Quarter and Full Year Guidance

For the second fiscal quarter ending July 31, 2022, ChargePoint ***expects revenue of $96 million to $106 million***. At the midpoint, this ***represents an anticipated increase of 80%*** as compared to the prior year's same quarter.

For the full fiscal year ending January 31, 2023, ChargePoint continues to expect:

- ***Revenue of $450 million to $500 million***. At the midpoint, this represents an anticipated increase of 96% as compared to the prior year
- ***Non-GAAP gross margin of 22% to 26%***

* * *

Second Quarter and Full Year Guidance

For the second fiscal quarter ending July 31, 2022, ChargePoint ***expects revenue of $96 million to $106 million***. At the midpoint, this represents an anticipated ***increase of 80%*** as compared to the prior year's same quarter.

For the full fiscal year ending January 31, 2023, ChargePoint continues to expect:

- ***Revenue of $450 million to $500 million***. At the midpoint, this represents an anticipated increase of 96% as compared to the prior year
- ***Non-GAAP gross margin of 22% to 26%*** . . .

On August 30, 2022, ChargePoint filed a current report with the SEC on Form 8-K, attached to which was a press release titled ChargePoint Reports Second Quarter Fiscal Year 2023 Financial Results ("8/30/22 Release"). The 8/30/22 Release stated, in relevant part:

***Second quarter fiscal 2023 revenue of $108 million*** exceeds top-end of quarterly guidance; ChargePoint ***re-affirms annual guidance***

- ***Revenue grew 93% year-over-year as the Company posted its first $100 million quarter***
- ***GAAP and Non-GAAP gross margin improved 2 percentage points*** quarter-over-quarter
- ChargePoint ***guides to third quarter fiscal 2023 revenue of $125-$135 million*** and confirms ***full-year revenue guidance of $450 million to $500 million***…

Second Quarter Fiscal 2023 Financial Overview

- Revenue. ***For the second quarter, revenue was $108.3 million, up 93%*** from $56.1 million in the prior year's same quarter. ***Networked charging systems revenue for the second quarter was $84.1 million, up 106%*** from $40.9 million in the prior year's same quarter and ***subscription revenue was $20.2 million, up 68%*** from $12.1 million in the prior year's same quarter.

* * *

Third Quarter and Full Year Guidance

***For the third fiscal quarter ending October 31, 2022, ChargePoint expects revenue of $125 million to $135 million***. At the midpoint, this represents an ***anticipated increase of 100%*** as compared to the prior year's same quarter.

For the full fiscal year ending January 31, 2023, ChargePoint continues to expect:

- ***Revenue of $450 million to $500 million***. At the midpoint, this represents an anticipated increase of 96% as compared to the prior year
- ***Non-GAAP gross margin of 22% to 26%*** . . .

Again commenting on the reported results, Romano stated in the 8/30/22 Release that "ChargePoint delivered ***another strong quarter, with continued growth*** across all verticals and geographies" and that "We continue to execute on our strategy, ***as demand continues to grow*** for our portfolio of industry-leading charging solutions . . ."

On December 1, 2022, ChargePoint filed a current report with the SEC on Form 8-K, attached to which was a press release titled ChargePoint Reports Third Quarter Fiscal Year 2023 Financial Results ("12/1/22 Release"). The 12/1/22 Release stated, in relevant part:

***Third quarter fiscal 2023 revenue of $125 million representing 93% year-over-year growth***

- ***GAAP and Non-GAAP gross margin both improved 1 percentage point*** quarter-over-quarter
- ChargePoint ***guides to fourth quarter fiscal 2023 revenue of $160-$170 million; full-year revenue guidance range revised upward $5 million*** from previous midpoint to $475 million to $485 million

* * *

Third Quarter Fiscal 2023 Financial Overview

- Revenue. Third quarter ***revenue was $125.3 million, up 93%*** from $65.0 million in the prior year's same quarter. ***Networked charging systems revenue for the third quarter was $97.6 million, up 105%*** from $47.5 million in the prior year's same quarter and ***subscription revenue was $21.7 million, up 62%*** from $13.4 million in the prior year's same quarter.

* * *

Fourth Quarter and Full Year Guidance

For the fourth fiscal quarter ending January 31, 2023, ChargePoint expects:

- ***Revenue of $160 million to $170 million***. At the midpoint, this ***represents an anticipated increase of 108%*** as compared to the prior year's same quarter
- A sequential ***Non-GAAP gross margin improvement*** from the third quarter's 20%, resulting in annual gross margin below previous guidance

For the full fiscal year ending January 31, 2023, ChargePoint expects:

- ***Revenue of $475 million to $485 million***. At the midpoint, this ***represents an anticipated increase of $5 million*** as compared to previous guidance
- ***Non-GAAP operating expenses of $325 million to $335 million***. At the midpoint, this represents an ***anticipated decrease of $30 million*** as compared to previous guidance

Also in the 8/30/22 Release, Romano boasted "ChargePoint delivered another quarter of growth exceeding 90% year-over-year, as we continue to scale the business to meet strong demand . . ." and that "Our networked, asset-light business model continues to enable our growth as we strive to deliver improved margins and operating leverage."

On March 2, 2023, ChargePoint filed a current report with the SEC on Form 8-K, attached to which was a press release titled ChargePoint reports fourth quarter and full fiscal year 2023 Financial Results ("3/2/23 Release"). The 3/2/23 Release stated, in relevant part:

***Fourth quarter fiscal 2023 revenue of $153 million representing 93% year-over-year growth***

- ***Full fiscal year revenue of $468 million representing 94% year-over-year growth***
- ChargePoint's annualized ***subscription revenue crosses $100 million***
- ***GAAP and Non-GAAP gross margin improved 4 and 3 percentage points*** quarter-over-quarter, respectively
- ***ChargePoint guides to first quarter fiscal 2024 revenue of $122-$132 million***

* * *

Fourth Quarter Fiscal 2023 Financial Overview

- Revenue. ***Fourth quarter revenue was $152.8 million, up 93%*** from $79.3 million in the prior year's same quarter. ***Networked charging systems revenue for the fourth quarter was $122.3 million, up 109%*** from $58.7 million in the prior year's same quarter and ***subscription revenue was $25.7 million, up 50%*** from $17.2 million in the prior year's same quarter.

- Gross Margin. ***Fourth quarter GAAP gross margin improved sequentially to 22%***, but was flat to the prior year's same quarter. Fourth quarter non-GAAP gross margin, which primarily excludes stock-based compensation expense, amortization from acquired intangible assets and non-recurring restructuring costs, improved sequentially to 23%, but was down from 24% in the prior year's same quarter.

* * *

Full Fiscal 2023 Financial Overview

- Revenue. ***For the full year, revenue was $468.1 million, an increase of 94%*** from $241.0 million in the prior year. ***Networked charging systems revenue for the full year was $363.6 million, an increase of 109%*** from $173.9 million, and ***subscription revenue was $85.3 million, up 59%*** from $53.5 million in the prior year.

- Gross Margin. ***Full year GAAP gross margin was 18%***, down from 22% in the prior year. Full year non-GAAP gross margin, which primarily excludes stock-based compensation expense, amortization from acquired intangible assets and non-recurring restructuring costs, was 20%, down from 24% in the prior year.

* * *

First Quarter of Fiscal 2024 Guidance

For the first fiscal quarter ending April 30, 2023, ChargePoint ***expects revenue of $122 million to $132 million***. At the midpoint, this represents an ***anticipated increase of 56%*** as compared to the prior year's same quarter.

Romano again touted the quarter's results in the 3/2/23 Release, stating "***ChargePoint delivered its largest sequential revenue growth to date and another record quarter***, although below our guidance range as supply challenges for our DC [direct current] solutions and quarter end shipment challenges at this growth rate persisted" and that the Company achieved "***94% year-over-year growth and deliver[ed] improving gross margin*** and better operating expense leverage as we progress toward profitability."

On June 1, 2023, ChargePoint filed a current report with the SEC on Form 8-K, attached to which was a press release titled ChargePoint Reports First Quarter Fiscal Year 2024 Financial Results ("6/1/23 Release"). The 6/1/23 Release stated, in relevant part:

> ***First quarter fiscal 2024 revenue of $130 million representing 59% year-over-year growth***
>
> - ***Gross margin increases to 23% GAAP and 25% Non-GAAP***
> - Plans to reduce Non-GAAP Adjusted EBITDA Loss approximately two-thirds by the fourth quarter of fiscal 2024 as compared to the first quarter
> - ***ChargePoint guides to second quarter fiscal year 2024 revenue of $148 - $158 million*** . . .
>
> First Quarter Fiscal 2024 Financial Overview
>
> - Revenue. ***First quarter revenue was $130.0 million, up 59%*** from $81.6 million in the prior year's same quarter. ***Networked charging systems revenue for the first quarter was $98.3 million, up 65%*** from $59.6 million in the prior year's same quarter. ***Subscription revenue was $26.4 million, up 49%*** from $17.6 million in the prior year's same quarter.
>
> - Gross Margin. ***First quarter GAAP gross margin was 23%, up from 15%*** in the prior year's same quarter. ***First quarter non-GAAP gross margin***, which primarily excludes stock-based compensation expense and amortization from acquired intangible assets, ***was 25%, up from 17%*** in the prior year's same quarter.
>
> Second Quarter of Fiscal 2024 Guidance
>
> For the second fiscal quarter ending July 31, 2023, ChargePoint ***expects revenue of $148 million to $158 million***. At the midpoint, this ***represents an anticipated increase of 41%*** over the prior year's same quarter. . .

According to Romano in the 6/1/23 Release, "ChargePoint delivered ***strong results in the first quarter, growing at nearly 60%*** year-over-year. We focused on delivering our broad portfolio of charging solutions across North America and Europe, while ***continuing to improve gross margins***, and managing operating expenses" and that "The positive first quarter results are a testament to the strength and diversity of our business. . . we believe we remain well positioned to take advantage of the inevitable long-term growth opportunity ahead.'

On June 8, 2023, ChargePoint filed a Quarterly Report with the SEC on Form 10-Q ("1Q 2024 10-Q"). Attached to the the 1Q 2024 10-Q were certifications signed by Romano and Jackson pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the Company's financial reports and the effectiveness of internal controls.

The 1Q 2024 10-Q stated, in relevant part:

> ***Gross profit increased during the three months ended April 30, 2023*** compared to the three months ended April 30, 2022 primarily ***due to an increase in Networked Charging Systems sales*** that resulted from an increase in the number of Networked Charging Systems delivered and an increase in Subscriptions revenue.
>
> ***Gross margin increased during the three months ended April 30, 2023*** compared to the three months ended April 30, 2022 primarily ***due to efficiencies realized in managing cost of Networked Charging Systems***. . .

## C. The Truth Gradually Emerges

ChargePoint's true financial condition began to come to light on September 6, 2023, when the Company filed with the SEC a current report on Form 8-K which attached a press release titled ChargePoint Reports Second Quarter Fiscal Year 2024 Financial Results ("9/6/23 Release"). In the 9/6/23 Release, the Company reported the following concerning its gross margin and net income:

> ***Gross Margin. Second quarter GAAP gross margin was 1%, down from 17% in the prior year's same quarter, and non-GAAP gross margin was 3%, down from 19% in the prior year's same quarter, in both cases primarily due to a $28.0 million, or 19 percentage point, inventory impairment charge. This inventory impairment charge was taken to address legacy supply chain-related costs and supply overruns on a particular DC product***.
>
> ***Net Income/Loss. Second quarter GAAP net loss was $125.3 million, up from $92.7 million in the prior year's same quarter***. Non-GAAP pre-tax net loss was $86.1 million as compared to $62.3 million in the prior year's same quarter, both ***reflecting the $28.0 million inventory impairment charge***. Non-GAAP Adjusted EBITDA Loss was $81.2 million also reflects this inventory impairment charge in the second quarter, as compared to $56.2 million in the prior year's same quarter.

Still, the 9/6/23 Release contained the following positive guidance:

> For the third fiscal quarter ending October 31, 2023, ChargePoint expects:
>
> - ***Revenue of $150 million to $165 million***. At the midpoint, this represents an ***anticipated increase of 26%*** as compared to the prior year.
> - ***Non-GAAP gross margin of 22 to 25%***.
> - Non-GAAP operating expenses of $81 million to $84 million.
>
> For the fourth fiscal quarter ending January 31, 2024, ChargePoint expects non-GAAP operating expenses of $79 million to $82 million.

> ***For the full fiscal year ending January 31, 2024, ChargePoint expects revenue of $605 million to $630 million***. At the midpoint, this represents an anticipated increase of 32% as compared to the prior year.

> Commenting on the results in the 9/6/23 Release, Romano stated:

> ***In the second quarter, ChargePoint delivered solid growth***. Our revenue of $150 million represents a 39% year-over-year increase despite a hesitant economy . . . In the quarter we fortified our access to working capital with a $150 million revolving credit facility and $38 million raised via our 'at-the-market' offering. ***We took an inventory impairment charge to address a significant supply-chain related issue, and we announced an estimated $30 million in annualized operating expense savings from reorganizing the business for agility, efficiency and scale***. We remain committed to delivering on our goal of generating positive non-GAAP adjusted EBITDA by the end of calendar 2024.

The same day, September 6, 2023, the Company hosted an earnings call with analysts and investors to discuss the 9/6/23 Release, during which Jackson stated the following concerning revenue and margin guidance:

> Turning to guidance. ***For the third quarter of fiscal 2023, we expect revenue to be $150 million to $165 million, up 26%*** year-on-year and up 5% sequentially at the midpoint. ***For the full fiscal year, we are guiding to $605 million to $630 million, up 32%*** year-on-year at the midpoint.

> ***Regarding gross margin, for the third quarter, we expect to be between 22% and 25%*** on a non-GAAP basis as we work through the inventory levels discussed earlier. With the ***inventory issue behind us and aggressive programs for improving our cost structure on supply and manufacturing, we would expect to resume continued improvement in gross margin next year***. . .

On this news, ChargePoint's stock price fell approximately 11%, or $6.29 per share at close on September 7, 2023.

On September 11, 2023, ChargePoint filed with the SEC a quarterly report on Form 10-Q for the quarter ended July 31, 2023 ("2Q 2024 10-Q"), which included SOX certifications signed by Romano and Jackson, again attesting to attesting to the accuracy of the Company's financial reports and the effectiveness of internal controls.

The 2Q 2024 10-Q stated, in relevant part "***For the remainder of fiscal year 2024, ChargePoint expects revenue to grow*** in both Networked Charging Systems and subscriptions due to increased demand in EVs and the related charging infrastructure market."

Regarding the $28 million impairment charge, the 2Q 2024 10-Q stated:

> Inventory levels are analyzed periodically and written down to their net realizable value if they have become obsolete, have a cost basis in excess of expected net realizable value or are in excess of expected demand. ***During the three months ended July 31, 2023, the Company recorded an impairment charge of $28.0 million, consisting of $15.0 million charge to write down the carrying value of certain inventory on hand, as well as $13.0 million charge for losses on noncancelable purchase commitments for inventory to be received after July 31, 2023, to reduce the carrying value of certain DC fast charging products to their estimated net realizable value.*** The inventory impairment charge is included in the cost of revenue - networked charging systems in the condensed consolidated statements of operations.

> The 2Q 2024 10-Q included the following concerning inventory levels:

> ***ChargePoint's revenue growth is directly tied to the number of passenger and commercial EVs sold, which it believes drives the demand for EV charging infrastructure***. The market for EVs is still rapidly evolving and although demand for EVs has grown in recent years, there is no guarantee of such future demand.

> * * *

> ChargePoint depends on the timely supply of materials, services and related products to meet the demands of its customers, which depends in part on the timely delivery of materials and services from suppliers and contract manufacturers. Significant or sudden increases in demand for EV charging stations, as well as worldwide demand for the raw materials and services that ChargePoint requires to manufacture and sell EV charging stations, including component parts, may result in a shortage of such materials or may cause shipment delays due to delays could adversely impact ChargePoint's suppliers' ability to meet ChargePoint's demand requirements.

The above statements, issued on September 6 and 11, 2023 also were materially false and misleading and/or lacked a reasonable basis when made because they continued to omit: (1) ChargePoint's reported revenue was not attributable to organic demand, but rather a product of unauthorized shipments, shipments of incomplete or incorrect items and channel stuffing and thus largely illusory booked using accounting practices that violated both GAAP and the Company's own revenue recognition policy; (2) ChargePoint was incurring undisclosed component cost increases and supply overruns linked to its first-generation DC charging products likely to require the Company to incur impairment charges and related costs that would adversely affect profitability; and (3) the Company internal controls were materially deficient.

ChargePoint's true financial condition became known on November 16, 2023, when the Company filed with the SEC a current report on Form 8-K attaching two press releases. One of the press releases, titled ChargePoint Provides Certain Preliminary Third Quarter Financial Results and Schedules Earnings Call for December 6, 2023, stated, in relevant part:

> 'Our core markets of North America and Europe both came under pressure late in the third quarter, with revenue falling far short of expectations. Overall macroeconomic conditions, along with fleet and commercial vehicle delivery delays impacted anticipated deployments with government, auto dealership and workplace customers.' said Rick Wilmer, President and CEO of ChargePoint.
>
> Over the past 18 months in his prior role as Chief Operating Officer, Wilmer has completed a thorough analysis of ChargePoint's supply chain, manufacturing partnerships and inventory management approach. 'The ChargePoint board and I are committed to significantly improving operational execution to ensure that the Company is building a stronger, more resilient business for the benefit of all stakeholders. Our first steps are to take an additional non-cash inventory impairment charge related to product transitions and to better align inventory with current demand. We remain committed to our goal of generating positive adjusted EBITDA in the fourth quarter of calendar 2024,' said Wilmer.
>
> Preliminary Third Quarter Fiscal Year 2024 Financial Performance
>
> - ***Revenue of $108 to $113 million, as compared to $150 to $165 million as previously expected***.
> - ***ChargePoint expects to take a non-cash impairment charge of $42 million resulting in GAAP gross margin of negative 23% to negative 21% and non-GAAP gross margin of negative 19% to negative 17%***.
> - Pre-impairment non-GAAP gross margin of 19% to 21%, as compared to 22% to 25% as previously expected. . .

The other press release ChargePoint issued on November 16, 2023, titled ChargePoint Announces Executive Leadership Changes, informed investors that the Company had unceremoniously removed Romano and Jackson from their leadership positions, and appointed Wilmer as its new President and Chief Executive Officer and appointed Wilmer to the Board, and appointed Mansi Khetani as interim CFO:

> Wilmer succeeds Pasquale Romano, who has served as ChargePoint's CEO since 2011. Mr. Romano will remain as an advisor to ensure a seamless transition. ChargePoint also announced that Chief Financial Officer Rex Jackson has departed the company, effective today. Mansi Khetani, who is currently ChargePoint's Senior Vice President of Financial Planning and Analysis, has been named interim CFO and ChargePoint will commence a search to identify a permanent candidate.

On this news, ChargePoint's stock price fell approximately an additional 35%, closing at $2.02 per share on November 17, 2023.

These revelations suggest that the prior statements highlighted herein concerning the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis when made because: (1) ChargePoint's reported revenue was not attributable to organic demand, but rather a product of unauthorized shipments, shipments of incomplete or

incorrect items and channel stuffing and thus largely illusory booked using accounting practices that violated both GAAP and the Company's own revenue recognition policy; (2) ChargePoint was incurring undisclosed component cost increases and supply overruns linked to its first-generation DC charging products likely to require the Company to incur impairment charges and related costs that would adversely affect profitability; and (3) the Company internal controls were materially deficient.

**D. Insider Sales**

In addition to the above, Chizen, Jackson, Linse, Romano, Singh-Bushell and Wilmer sold ChargePoint stock while in possession of the material, nonpublic information discussed herein. These transactions were suspicious both in timing and amount. Specifically:

- Chizen sold 120,000 shares of personally held ChargePoint stock for over $1.86 million between June 8, 2022 and October 3, 2022;
- Jackson sold 670,269 shares of personally held ChargePoint stock for over $4.6 between December 21, 2021 and September 8, 2023;
- Linse sold 14,135,981 shares of personally held ChargePoint stock for over $144.6 million between December 10, 2021 and September 15, 2023;
- Romano sold 1,275,802 shares of personally held ChargePoint stock for over $15.2 million between April 22, 2022 and August 18, 2023;
- Singh-Bushell sold 4,622 shares of personally held ChargePoint stock for over $25,000 on September 20, 2023; and
- Wilmer sold 33,490 shares of personally held ChargePoint stock for over $250,000 between March 21, 2023 and September 25, 2023.

In total, Chizen, Jackson, Linse, Romano, Singh-Bushell and Wilmer sold over 16.2 million shares of personally-held stock for more than $166.6 million at artificially inflated prices while in possession of material, non-public information.

**E. The Securities Class Action**

The above-discussed conduct now is the subject of a securities class action. On November 29, 2023, plaintiff Farooq Khan filed a federal securities class action in the U.S. District Court for the Northern District of California, captioned *Khan v. ChargePoint Holdings, Inc.*, No. 5:23-cv-06172-NW. On March 6, 2026, Mr. Khan filed the Third Amended Class Action Complaint ("TAC"), alleging that ChargePoint issued myriad misstatements—including those discussed herein—concerning ChargePoint's supply chain management, revenue growth, inventory value and internal controls.

The defendants subsequently moved to dismiss the TAC, as they had plaintiff's prior complaint, arguing that plaintiff failed to adequately allege that defendants engaged in a deceptive scheme and that their statements were false when made. On May 21, 2026, the Court denied defendants' motion to dismiss in its entirety, allowing the case to proceed. As a result, the Company is exposed to near-existential financial exposure and reputational harm.

## II. DEMAND PURSUANT TO DELAWARE LAW

Based on these events, the Stockholder contends that Management breached their fiduciary duties of loyalty and good faith in connection with their management, operation and oversight of the Company's business by making, or causing to be made, false and misleading statements about the Company's prospects.

Accordingly, pursuant to Delaware law, on behalf of the Stockholder, we hereby demand that the Board: (i) undertake (or cause to be undertaken) an independent internal investigation into Management's violations of Delaware and/or federal law; and (ii) commence a civil action against each member of Management to recover for the benefit of the Company the amount of damages sustained by the Company as a result of their breaches of fiduciary duties alleged herein.

In the meantime, because the statute of limitations to commence a civil action against Management to recover for the benefit of the Company likely expires on November 16, 2023 under 10 Del. C. § 8106, and because Stockholder wishes to afford the Board sufficient time to undertake the independent investigation sought herein and commence litigation if necessary, Stockholder further requests that the Board enter into tolling agreements with each of the members of Management names herein.

Very truly yours,

**THE WEISER LAW FIRM, P.C.**

*s/ John J. Gross*
John J. Gross

# EXHIBIT B

**John J. Gross**

**From:** Bartlett, Jaime <jbartlett@sidley.com>
**Sent:** Friday, October 16, 2026 12:14 PM
**To:** John J. Gross
**Cc:** Brody, Sara; Georges, Chaddy G.
**Subject:** ChargePoint Demand

Counsel,

I write to acknowledge ChargePoint's receipt of the October 9, 2026 demand to investigate sent on behalf of your client, Morgan Smith. The demand did not include proof of Ms. Smith's ownership of ChargePoint stock. Please provide appropriate documentation of ownership and we will respond in due course.

Best,
Jaime

**JAIME A. BARTLETT**

**SIDLEY AUSTIN LLP**
101 California Street
San Francisco, CA 94111
+1 415 772 1228
jbartlett@sidley.com
www.sidley.com

SIDLEY

****************************************************************************************************
This e-mail is sent by a law firm and may contain information that is privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify us immediately.
****************************************************************************************************

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

**CHARGEPOINT HOLDINGS, INC. VERIFICATION**

I, Morgan Smith, hereby verify that I am familiar with the allegations in the Verified Shareholder Derivative Complaint, and that I have authorized the filing of the Verified Shareholder Derivative Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 11/12/2026

Morgan Smith
Morgan Smith (Nov 12, 2026 09:23:24 EST)

Morgan Smith